STATE of Tennessee, Appellee,

v.

Rodney J.D. SMITH and James E. Smith, Jr., Appellants.

Supreme Court of Tennessee, at Nashville.

Feb. 14, 1994.

Robert D. Massey, Pulaski, for appellant, Rodney J.D. Smith.

J. Daniel Freemon, Freemon & Hillhouse, Lawrenceburg, for appellant, James E. Smith, Jr.

Charles W. Burson, Atty. Gen. and Reporter, and Gordon W. Smith, Deputy Atty. Gen., Nashville, for appellee, State of Tenn.

John G. Oliva, Nashville, for amicus curiae, the Tennessee Ass'n of Crim. Defense Lawyers.

## OPINION

ANDERSON, Justice.

The sole issue in this appeal is whether manifest necessity required the trial court to declare a mistrial in the defendants' trial for felony murder and armed robbery. If so, the defendants could be retried without violating the double jeopardy clauses of the Tennessee and United States Constitutions. After concluding that there was a distinct possibility of defense attorney misconduct affecting the trial, the trial court determined that manifest necessity existed requiring it to declare a mistrial. When the State sought a retrial, the defendants moved to dismiss the indictments on the ground of double jeopardy. The trial court denied the motion but granted an interlocutory appeal. The Court of Criminal Appeals affirmed. We conclude that manifest necessity existed for declaring a mistrial, and that the ends of public justice would have been defeated had the trial been allowed to continue. Accordingly, neither the state nor federal constitutional double jeopardy provision applies, and the defendants may be retried on the indictment for felony murder and armed robbery.

### FACTUAL BACKGROUND

The defendants, Rodney J.D. Smith and James E. Smith, Jr., were indicted for the armed robbery and first-degree felony murder of Bartlett Marston in 1989. The defendant, Rodney J.D. Smith, was represented by Robert Massey, the Public Defender, and the defendant, James E. Smith, Jr., was represented by J. Daniel Freemon. Michael McConnell was also charged as a co-defendant and was represented by counsel. On November 20, 1990, McConnell pled guilty to second-degree murder and unrelated charges, and was sentenced to seventy years. As part of the guilty plea agreement, McConnell promised to testify truthfully in the prosecution against the Smiths.

The Smiths' trial began on May 6, 1991, and by May 8, 1991, a jury was selected and sworn. After the parties announced ready and the trial was about to begin, the State requested a recess because they had learned that McConnell would not testify. A short time later, the judge called McConnell as a witness with his attorneys present in a jury-out hearing to determine the reason for his decision. McConnell acknowledged that he had pled guilty to second-degree murder in the Marston killing and had agreed to testify truthfully at the defendants' trial. He then said that he had decided the night before not to testify because he was afraid of being killed in prison if he testified.

Initially, McConnell denied speaking to anyone before deciding not to testify; however, he later testified that Daniel Freemon's brother, attorney Robert Freemon, had come to see him at the jail the previous night. According to McConnell, the only conversation that took place was that Robert Freemon told him to be in court at 7:00 a.m. the next morning. The jail records verified that Robert Freemon had visited McConnell the night before trial.

McConnell also testified that he had talked to Robert D. Massey, the Public Defender, that morning and told him he did not remember anything, and that Massey told him that if he took the stand and testified that he could not remember, the State could not revoke the plea agreement and retry him for first-degree murder because "that would be double jeopardy, because the case was over 120 days old." McConnell was asked if he did remember:

> THE COURT: Do you remember the events that occurred, Mr. McConnell?
>
> MR. McCONNELL: Yes, sir.
>
> THE COURT: And in those events were the defendant Smith brothers a part of the murder of Bartlett Marston?
>
> MR. McCONNELL: Yes, sir.

Jim Matthews, the District Attorney's investigator, also testified at the jury-out hearing. Matthews said McConnell had told him earlier that morning that he had decided not to testify; that he had spoken to a lawyer the night before trial who he would not name, who had informed him that if he did not testify, the State could not revoke the plea agreement and bring the prior charges back up against him.

McConnell was called back to the stand by the court and asked again what he was told about double jeopardy:

THE COURT: What was said to you about double jeopardy?

MR. McCONNELL: Said—you know, like I told you before, if I got up here and I said I didn't remember, that they couldn't carry me back and retry me on this case, because it would be double jeopardy, because it had been over 120 days since I was sentenced.

THE COURT: But Mr. McConnell, you really did remember, didn't you?

MR. McCONNELL: Yes, sir.

THE COURT: All right.

McConnell also admitted that the conversation with Massey was not the first time he had heard about double jeopardy. He said that about two weeks earlier, defense attorney "Daniel Freemon brought me some papers over there and told me to read them...." McConnell said the papers were the transcript from a similar case in which Michael Murphy was a criminal defendant.[1]

After the questioning ended, McConnell was then asked by his attorney if he had now decided to testify, and he responded that he had.

After the jury-out hearing ended, the trial judge took a recess that lasted only nine minutes. At some point during that time, the trial judge called the prosecuting attorney into his chambers for an *ex parte* discussion. The record does not contain a verbatim transcript of the *ex parte* discussion; however, there is an agreed stipulation that the trial judge first stated his intention to declare a mistrial and then asked the prosecuting attorney whether she believed a retrial would be barred by double jeopardy. Her response was not a part of the stipulation. After the recess, the trial judge *sua sponte* declared a mistrial, stating:

Because of matters that have come to the attention of the Court this morning, and for which the report has just been made, as it dealt with the witness, McConnell, and activities of persons acting on behalf of the defendants in this case, the Court declares a mistrial in this case, at this time.

At the request of the State, the trial court made a specific finding of manifest necessity as follows:

Manifest necessity occurs in that the Court made an arrangement; accepted a plea to second degree murder by Mr. McConnell on November 20 of 1990, and specifically, at least three times in the course of that finding, informed Mr. McConnell that my acceptance of his plea was conditioned on his truthful testimony in this case. He had two very capable appointed counsel to represent him.

He was then advised by counsel representing the defendants in this case, in a manner that was contrary to that which the State had stated in the hearing of November 20; that was directly contrary to the agreement that was made by Mr. McConnell, and in a situation in which the interests of Mr. McConnell and the interests of the defendants in this case were opposing interests.

Under those conditions, the Court has no choice but to declare a mistrial in this case, with or without the objections of the defendants.

So ordered.

Defense attorney Massey then made the following request:

MR. MASSEY: Could we make the record, some, Judge. I would like for Joe Henry to come in and reiterate the conver-

---

1. In the Michael Murphy papers, which are an exhibit on appeal, the State moved to set aside a plea bargain because Murphy did not testify "fully, completely, and truthfully" against defendant, Dale Staggs. Michael Murphy's attorney, Robert Massey, filed a response that the court had no jurisdiction since the motion to set aside the plea agreement came too late. The trial court's judgment denied the motion because there was nothing in the record to indicate that defendant Murphy had agreed to testify.

Portions of the Michael Murphy records are underlined and a handwritten note had been placed on the defendant Murphy's response as follows: "Note: Mike Murphy testified at Dale Staggs' trial he could not remember anything." A handwritten note was also placed on the court's judgment as follows: "Also note: As mentioned the judgment was first over 120 days old (Rule 35) as in Mike's case." The record is not clear as to whether the papers were in that condition when Freemon gave them to McConnell.

sation that I had with Mike McConnell in Joe Henry's presence, so that the record would be clear as to what exactly I told Mike McConnell, because right now, I think the record is not clear.

THE COURT: There will be a record made. It will not be made at this time.

After the mistrial, an attorney general pro tem was appointed to investigate the conduct of defense counsel.[2]

When the State sought to retry the case, the defendants filed a motion to dismiss the indictment for felony murder and armed robbery because of double jeopardy. After a hearing, Special Judge Allen R. Cornelius, Jr., denied the motion, but permitted an interlocutory appeal to the Court of Criminal Appeals. The Court of Criminal Appeals affirmed. We have determined that the constitutional prohibition against double jeopardy does not apply in this case because manifest necessity required the trial judge to declare a mistrial. We elaborate on the reasons below.

### DOUBLE JEOPARDY

■ It is well established that the Tennessee[3] and United States[4] Constitutional provisions barring double jeopardy protect a criminal defendant from a second prosecution for the same offense, and multiple punishments for the same offense. *State v. Mounce*, 859 S.W.2d 319, 321 (Tenn.1993); *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). The policy underlying the provision,

> one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and

power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); *State v. Knight*, 616 S.W.2d 593, 595 (Tenn.1981). Because jeopardy attaches at the time the jury has been impaneled and sworn, the constitutional protections against multiple prosecutions also encompass the criminal defendant's "valued right to have his trial completed by a particular tribunal."[5] Nevertheless, neither the state nor the federal Double Jeopardy Clause offers a guarantee to the criminal defendant that the government will vindicate its societal interest in the enforcement of the criminal laws in one proceeding.[6] As the *Wade* court pointed out:

> There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.

*Id.*, 336 U.S. at 689, 69 S.Ct. at 837.

■ Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first enunciated by Justice Story's opinion for the Court in *United States v. Perez*,

---

**2.** The Tennessee Bureau of Investigation, at the request of the District Attorney General pro tem appointed to the case, conducted an investigation into the incident and submitted a report. Based on that investigation and report, the District Attorney General pro tem concluded there was insufficient evidence to present any criminal charges to the Lawrence County Grand Jury.

**3.** Article I, Section 10 provides, "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb."

**4.** The Double Jeopardy Clause of the Fifth Amendment provides: "nor shall any person be subject for the same offense to be twice put in

jeopardy of life or limb." It is applicable to the states through the Fourteenth Amendment Due Process Clause. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

**5.** *Oregon v. Kennedy*, 456 U.S. at 671, 102 S.Ct. at 2087 (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)); *State v. Williams*, 827 S.W.2d 804, 807 (Tenn.Cr. App.1991).

**6.** *United States v. Jorn*, 400 U.S. 470, 483–84, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971) (plurality opinion); *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837.

22 U.S. (9 Wheat) 579, 6 L.Ed. 165 (1824), and adopted in Tennessee in *Mahala v. State*, 18 Tenn. 532, 536 (1837). Although *Perez* dealt with the most common form of "manifest necessity," the declaration of a mistrial following a jury's inability to reach a verdict, the principle stated there applies generally.

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greater caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*Perez*, 22 U.S. at 580. The doctrine of "manifest necessity" safeguards the accused's right to have his trial completed by a particular tribunal, while at the same time preserving "the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837; *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *Etter v. State*, 185 Tenn. 218, 205 S.W.2d 1, 3 (1947).

 Both the United States Supreme Court and this Court have adopted certain principles which guide the application of the doctrine by trial courts. First, the determination of whether to grant a mistrial and allow a retrial rests within the sound discretion of the trial court. Second, when determining whether a mistrial is appropriate, trial courts should not mechanically apply an abstract standard, but instead should consider all relevant factual circumstances of the particular case. *See Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 831; *Mounce*, 859 S.W.2d at 322; *Williams*, 827 S.W.2d at 808. Third, the burden of proving manifest necessity rests on the State. Finally, retrial will not be prohibited by double jeopardy principles where the ends of justice, under the circumstances, would otherwise be defeated, or where the circumstances show that a fair and unbiased trial could not be had, or where any unforeseen emergency, contingency, or happening after the empaneling of the jury prevents the trial from going forward according to orderly and established legal procedure. *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973); *Jones v. State*, 218 Tenn. 378, 403 S.W.2d 750, 753 (1966).

 The standard of appellate review of mistrial decisions was discussed by the United States Supreme Court in *Arizona v. Washington, supra*. The Court observed that because of the wide range of circumstances that can result in a mistrial,[7] the deference accorded a trial court's decision to grant a mistrial based on a finding of manifest necessity varies depending upon the particular circumstances of each case. According to the *Arizona* court, an appellate court should strictly scrutinize the trial court's exercise of discretion when the basis for the mistrial is the unavailability of critical prosecution evidence or when there is reason to believe that the prosecutor is using the State's resources to harass or to achieve a tactical advantage over the accused. They also recognized that on the other end of the spectrum great deference should be paid by

---

7. *See e.g. Wade v. Hunter, supra* (court-martial proceeding terminated because of military necessity); *Arizona v. Washington, supra* (improper remarks by the defense counsel during opening statement); *United States v. Ruggiero*, 846 F.2d 117 (2nd Cir.1988) (distinct possibility of defense jury tampering); *United States v. Mastrangelo*, 662 F.2d 946 (2nd Cir.1981), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982) (distinct possibility of defense involvement in the murder of a principal witness); *United States v. Grasso*, 600 F.2d 342 (2nd Cir.1979) (prosecution witness recanted after testifying).

a reviewing court to the trial court's decision to declare a mistrial because the jury is unable to agree upon a verdict. The court concluded that when the decision to declare a mistrial is based on factors that traditionally have been subject to deferential appellate review, such as the credibility of witnesses, then the trial court's declaration of mistrial is entitled to "special respect;" and that in such situations an appellate court fulfills its duty, if after review, it concludes that the trial judge exercised "sound discretion" in declaring a mistrial. *Arizona v. Washington*, 434 U.S. at 509–14, 98 S.Ct. at 832–35.

▮ In the present case, the trial court's decision to declare a mistrial was based on its hearing live testimony at a jury-out hearing, its evaluation of the trial situation and its alternatives. We have reviewed the record and our examination convinces us that the trial court exercised sound discretion in concluding that the circumstances of this case constituted manifest necessity to declare a mistrial.

The proof introduced at the jury-out hearing raised at least a "distinct possibility" that defense counsel had encouraged one of the prosecution's primary witnesses to ignore his plea agreement with the State. *See United States v. Ruggiero*, 846 F.2d at 123–24; *United States v. Mastrangelo*, 662 F.2d at 952 (holding that the record need only show that there is a "distinct possibility" that the defendants were responsible for the events resulting in a mistrial). After a T.B.I. investigation of defense counsel's conduct, the District Attorney pro tem concluded there was insufficient evidence to pursue criminal charges; however, almost four months passed before the investigation was completed.

Moreover, we are persuaded that the declaration of a mistrial in this case preserved the public's interest in "fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837. Despite the fact that defense counsel in this case were eventually cleared of any criminal misconduct, it is fundamentally important to the integrity of the administration of justice and critical to the very soul of the judicial system that trials be conducted without the taint of possible witness tampering. The declaration of a mistrial in this case afforded the time necessary to conduct an investigation that lifted the taint. The defendants do not consider the broader public interest when they argue that the mistrial was improper because the jury was unaware of possible witness tampering. Under the circumstances of this case, "the public's interest in fair trials designed to end in just judgments" [8] must prevail over the defendants' "valued right" to have their trial concluded before the first jury impaneled.

▮ The defendants also argue that other feasible alternatives existed to declaring a mistrial, and they insist that the trial court should have made a finding on the record as to the reasons why an alternative route was not pursued. That same argument was rejected, at least, implicitly by the *Arizona* Court when it reversed the Ninth Circuit and upheld the trial court's order of mistrial, even though there was no explicit finding of manifest necessity nor an explicit consideration of alternatives to a mistrial. The *Arizona* Court observed that "[n]o matter how desirable such procedural assistance may be, it is not constitutionally mandated in a case such as this," and remarked that "the basis for the trial judge's mistrial order is adequately disclosed by the record, which includes the extensive argument of counsel prior to the judge's ruling." *Id.*, 434 U.S. at 517, 98 S.Ct. at 836.

▮ We are persuaded that the same analysis applies in this case. Although the record does not contain the argument of counsel, it does contain the testimony of the witnesses upon which the trial court's decision was based and the questions and statements of counsel. A trial court should, of course, always consider alternatives to a mistrial. However, we are not prepared to hold that such consideration was not given simply because explicit findings as to the unacceptability of specific alternatives were not made on the record.

---

**8.** *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837.

■ Finally, we address the defendants' complaints that they were neither given the opportunity to be heard, nor allowed to make an offer of proof at the time the trial court declared the mistrial. In this case, attorney Massey asked to make a limited offer of proof by offering McConnell's attorney, Joe Henry, Jr., to prove what Massey said to McConnell in Joe Henry's presence, a subject Massey had already addressed with McConnell. The trial court denied the request. We have often emphasized the importance of an offer of proof to meaningful appellate review. *State v. Coker*, 746 S.W.2d 167 (Tenn.1987); *State v. Goad*, 707 S.W.2d 846 (Tenn.1986); *see also* Tenn.R.Evid. 103. Here, the trial court should have allowed defense counsel that opportunity. We also agree with the defendants that the *ex parte* communication between the trial court and the prosecuting attorney was inappropriate. *See* Supreme Court Rule 10, Canon 3(A)(4).[9] Based on the stipulation in the record, however, the trial court had already decided to declare a mistrial at the time the conversation occurred. Accordingly, the contact had no impact on the ultimate decision. In the circumstances of this case, the record is sufficient to establish that the trial court exercised sound discretion in declaring a mistrial.

## CONCLUSION

Because the evidence presented at the jury-out hearing established a "distinct possibility" that defense counsel had encouraged one of the State's primary witnesses to ignore his plea agreement to testify truthfully, manifest necessity for the declaration of a mistrial existed. It is fundamentally important to the integrity of the administration of justice and critical to the very soul of the judicial system that trials be conducted without the taint of possible witness tampering. The declaration of a mistrial in this case afforded the time necessary to conduct an investigation that lifted the taint. We conclude that the declaration of a mistrial in this case preserved the public's interest in "fair trials designed to end in just judgments."

We are satisfied that the trial court exercised sound discretion in finding that manifest necessity existed for declaring a mistrial. Retrial of these defendants is not inconsistent with the state and federal constitutional provisions against double jeopardy.

The judgment of the Court of Criminal Appeals is affirmed. Costs are equally taxed to the defendants. The cause is remanded to the trial court for proceedings consistent with this Opinion.

REID, C.J., and DROWOTA and O'BRIEN, JJ., concur.

DAUGHTREY, J., not participating.

---

**9.** The Rule provides in pertinent part: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding...."